Filed 9/3/14  In re M.Z. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re M.Z., a Person Coming Under the Juvenile Court Law. | B254121 (Los Angeles County Super. Ct. No. DK00746) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff, Respondent and Cross-appellant. <br><br> v. <br><br> R.P., <br><br> Objector, Appellant and Cross-respondent. | |

APPEALS from orders of the Superior Court of the County of Los Angeles, Stephen Marpet, Commissioner.  Affirmed.

David A. Hamilton, under appointment by the Court of Appeal for Objector, Appellant and Cross-respondent.

John F. Krattli, County Counsel, Dawyn Harrison, Assistant County Counsel, Kimberly Roura, Deputy County Counsel for Plaintiff, Respondent and Cross-appellant.

## INTRODUCTION

Objector, appellant and cross-respondent R.P. (father) appeals from the juvenile court's jurisdiction and disposition orders finding his minor daughter, M.Z., a dependent child of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivision (b),[1] and removing M.Z. from his custody. Father contends that the juvenile court violated his trial rights and that there is not substantial evidence to support the juvenile court's jurisdictional order based on father's violent conduct toward mother on July 12, 2011, or the dispositional order removing M.Z. from father's custody. On its cross-appeal, plaintiff, respondent and cross-appellant Department of Family and Children's Services (Department) contends that the juvenile court erred in dismissing a count under section 300 subdivision (b) regarding father's driving while under the influence of alcohol (DUI). We affirm.

## BACKGROUND

On August 29, 2013, three year old M.Z and her family came to the attention of the Department when the Los Angeles County Sheriff's Department arrested mother for an outstanding methamphetamine possession warrant. Mother admitted she had been using methamphetamine for the past year. She said she had been living with the maternal grandparents and denied any present or past domestic violence.

A September 4, 2013, detention report provided that a children's social worker (CSW) advised father that M.Z. had been detained from mother. Father said that he had had a relationship with the mother for several years until he learned mother "cheated on" him. When M.Z. was about five months old, mother left M.Z. in father's care, and M.Z. would visit mother about every two weeks.

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

According to the Department's September 4, 2013, detention report, father informed the CSW that on August 1, 2013, he had been arrested for a DUI; said M.Z. and father's two other children were in the car when he was arrested; and admitted he consumed about 48 ounces of beer prior to driving. Father said that although he passed all of the field sobriety tests, he failed a breath test; and he will "fight" the "DUI case" because he believed "it was not a legal arrest." According to the Department's September 4, 2013, detention report, during the DUI incident, father "almost hit a huge truck," his alcohol level was .09 and .10 percent, and he was driving on a suspended driver's license.

The detention report also provided that father stated he would smoke medical marijuana "for back, arm and leg pain due to numerous car accidents," but he had not smoked marijuana since his arrest for DUI earlier that month. He also admitted that he and mother were involved in a July 2011 incident of domestic violence.

According to the detention report, the maternal grandmother stated that M.Z. spent substantial time with father, but he would not be an appropriate caretaker for M.Z. because he had recently been stopped for DUI. M.Z. indicated she knew both mother and father had been arrested. The Department detained M.Z. and placed her with the paternal grandparents.

On September 4, 2013, the Department filed a section 300 petition alleging M.Z. was at risk due to mother's abuse of methamphetamine and father's DUI incident. Also on September 4, 2013, father filed a statement regarding parentage in which he stated that from May 2010 to the date of M.Z.'s detention, M.Z. had lived with him and he provided her with care for all her basic needs.

At the September 4, 2013, detention hearing, the juvenile court ordered M.Z. detained and placed with the paternal grandparents. On September 11, 2013, the juvenile court ordered the Department to assist with setting an appropriate visitation schedule for the parents, to be monitored by M.Z.'s caregivers.

A November 19, 2013, jurisdiction/disposition report attached a copy of a notice of a November 19, 2013, "Jurisdiction/Disposition Hearing" served on father, stating that

father "has the right to be present at the hearing, to present evidence, and to be represented by an attorney." The report provided that mother and father stated they never married, and mother stated that until M.Z. had been detained by the Department in August 2013, mother and father arranged a mutually agreeable visitation schedule for M.Z. Regarding the DUI incident, father stated that he believed he was pulled over by the police because he took "evasive action to avoid hitting a semi-truck." The peace officer asked him, "Why did you cut that guy off?" Father stated he made his displeasure known about that comment, which father believed caused the peace officer to believe father was under the influence of alcohol. Father stated he successfully completed the field sobriety tests, but the peace officer made him repeat the tests and then arrested him. Father was transported to the Sheriff's Station where he took a breathalyzer test. Father said he "found the [breathalyzer test] process to be suspicious." Father said he did not believe he placed the children at risk of injury on August 1, 2013, and he believed the peace officer only arrested him for a DUI because father's attitude angered him. Father stated that after the DUI incident, he continues to drink alcohol during social occasions. Mother stated that while she lived with father, his daily routine included drinking a 24-ounce container of beer every day or every other day. Father said that he smoked marijuana a "couple of weeks ago," but he had never done so while M.Z. or any of her siblings were in his care. Father had a medical marijuana card.

According to the Department's November 19, 2013, jurisdiction/disposition report, father said there had been one physical altercation between him and mother. It occurred in 2011 in M.Z.'s presence. Father stated he believed mother was "on something" at the time as she suddenly showed up at his home to return his truck after borrowing it. He said mother exited the truck and began scratching the vehicle's hood and rims with a razor blade, then struck the back window with a baseball bat, shattering the window. Police were called, but no one was arrested.

The Department's jurisdiction/disposition report stated that mother's report of the 2011 incident of domestic violence "was generally opposite father's" report. Mother stated that father was the aggressor throughout the incident, father threw a shoe at her,

and the incident was not resolved until mother called her brother and her brother called law enforcement.

The jurisdiction/disposition report provided that mother said father had been a good father to M.Z. whenever she was in his care, and for the past year, father had custody of M.Z. every other weekend but whenever father wanted "extra time" with M.Z. she was fine with it. There were never "hassles" between her and father.

In the Department's November 19, 2013, jurisdiction/disposition report, the CSW stated that "[f]ather is very involved in each of his three children's day-to-day routines and activities . . . ." According to the paternal grandfather, the visits between M.Z. and her parents were going well.

According to the November 19, 2013, jurisdiction/disposition report, father said he was attending parenting classes voluntarily, was no longer in an intimate relationship with mother, and he and mother generally "get along well with one another." Father said he and mother wanted to regain custody of M.Z. and then address custody and visitation issues between themselves without third party assistance. He stated such an arrangement had worked well in the past so there was no reason he and mother could not do it again. The CSW stated, "Due to the children and the children's caregivers 'being on the go' almost 24/7, this CSW sees nothing wrong with allowing mother, father, [M.Z.'s] caregivers[,] and [the mother of father's other children] from making arrangements for the required amount of visits between all the involved parties however they see fit, with [the Department] being kept abreast of status of the visits on a regular and frequent basis."

In the Department's November 19, 2013, jurisdiction/disposition report, the CSW worker stated that "this CSW felt father wasn't being entirely truthful regarding the physical altercation between father and mother on 07/12/11 and the actions by father that led to his arrest for 'DUI' on 08/10/13." The CSW stated that the police reports of the two incidents confirmed that suspicion. In particular, the domestic violence report described multiple injuries on mother's body, and blood both on mother and at various places on the sidewalk. The CSW noted that "mother had suffered injuries on her mouth,

5

neck, arms, chest and legs," and "even if mother did provoke father into an altercation of some kind and kept harassing him as the confrontation continued, 6ft, 245 lb father . . . surely knew that he could inflict serious physical harm upon 5'6", 180lb mother . . . and yet the evidence indicates father chose to do exactly that . . . ."

The CSW also stated that the police report of father's DUI incident "paints a far different picture of what occurred that night" than father's description of the incident.

The police report regarding the July 12, 2011, physical altercation between father and mother was attached to the November 19, 2013, jurisdiction/disposition report. The police report stated that mother said on July 12, 2011, she drove father's vehicle to his house to pick up M.Z. Father was angry that mother did not answer her telephone. They began to argue outside father's house about mother's family and mother not answering her telephone. During the argument, mother started to say hello to M.Z. and father became angry because mother was not paying attention to him. At father's direction, mother reentered the driver's side of father's vehicle. Father and M.Z. entered the front passenger seat of the vehicle and M.Z. began jumping on the seat while between mother and father. Father and mother continued to argue in M.Z.'s presence. During different phases of the altercation, father continually took M.Z. in and out of his vehicle and his house. At one point, M.Z. was in mother's arms, and father grabbed and pulled her away from mother. Mother at first held M.Z. tightly, but then let go of her so M.Z. would not be injured.

The police report provided that mother said father pulled mother angrily by her legs while she was in father's vehicle, but father's father, who appeared during the incident along with father's sister and friends, separated M.Z.'s parents and then left the scene. Father also pulled mother by her arms and hair. While mother, father and M.Z. were in father' s vehicle, father twice punched mother's face with his fist. Mother told the police that she felt blood coming from her nose and was spitting blood on the sidewalk. Father also choked mother, and hit her on the head with keys and on her face with a shoe. As mother started to run away from father and yelled for father's father, father "caught" mother and began to choke her again. Father's father yelled at father to

stop choking mother, and father complied. Father then drove away in his vehicle with M.Z. Photographs were taken of injuries to mother's mouth, neck, arms, chest and legs, and of apparent blood located on the sidewalk in the front of the residence. M.Z. was present throughout much of the incident and witnessed a large part of the physical violence between father and mother.

The police report of the July 12, 2011, incident stated also that father's father said as he walked up to the house, he saw mother and father in the driveway. Mother was "holding a blade" and sitting next to father's vehicle. Father's father saw that the vehicle had scratches and he believed mother vandalized it and that caused the argument. Father wanted to leave "to defuse the argument," but mother forced herself into the vehicle and did not allow father to leave. Father tried to remove mother from the vehicle, but father's father told father to stop, and told mother she should exit the vehicle. Mother complied. Several minutes later father's father saw mother and father arguing again, and mother was slapping father. He saw father grab mother by the arms to prevent her from slapping him. Father's father separated mother and father, and father left the scene in his vehicle. Father's father did not witness father hitting or punching mother.

The police report regarding father's August 1, 2013, DUI incident also was attached to the November 19, 2013, jurisdiction/disposition report. According to the police report, a California highway patrol officer saw a big rig truck making a lane change, which was almost complete. Father's vehicle "came up fast on the big rig" and passed the truck using the section of the road dividing the two directions of traffic. The truck made an evasive turn back to the right to avoid colliding with father's vehicle and sounded its horn. The peace officer stopped father's vehicle.

The police report stated that the peace officer approached father's vehicle and immediately noticed a strong odor of alcohol and marijuana coming from inside. The peace officer saw three young children in the car, and father said they were his children. The peace officer informed father of the reason for the stop, and father stated he thought the truck was going the other way.

7

According to the police report, the peace officer asked father to exit the vehicle. The peace officer detected a strong odor of an alcoholic beverage and marijuana emitting from father's breath and person. Father's eyes were red and watery, and his speech was slurred.

The police report stated that father told the peace officer he had not consumed any alcoholic beverages that day, but he smoked marijuana earlier that day. The peace officer found that father was driving on a suspended license. According to the police report, the peace officer asked father to perform a series of field sobriety tests. Father was not able to correctly perform field sobriety tests. Due to father's objective signs and symptoms of intoxication and his poor performance on the field sobriety tests, the peace officer formed the opinion that father was driving with a suspended license while under the influence of alcohol.

The police report stated that the peace officer transported father to the police station for a breathalyzer test, and it was determined father's blood alcohol concentration was .10 and .09 percent. Father was booked and the children were released to the paternal grandmother.

A Multidisciplinary Assessment Team (MAT) report stated that although M.Z. did not report any traumas while she lived with mother or father, the paternal grandparents believed M.Z. may have witnessed or experienced some type of physical aggression in the past. The paternal grandparents stated that M.Z. had temper tantrums, threatened to have mother beat up the paternal grandmother, and talked and screamed in her sleep. The paternal grandmother believed that M.Z. had nightmares once a week.

On November 19, 2013, the Department filed a first amended petition adding allegations that M.Z. was at risk due to violent altercations between mother and father. The Department filed a last minute information for the court for the initial jurisdiction hearing scheduled for that day. It stated that concerning the July 12, 2011, physical altercation between father and mother, father said mother threw a shoe at him which struck him in the face. He picked up the shoe and threw it at mother, striking her in the face, resulting in mother suffering a bloody nose.

8

According to the last minute information for the court, mother told the CSW that on July 12, 2011, she drove to father's residence because she wanted to take M.Z. to a birthday party. She and father began to argue and father struck her on the face with a shoe. Father drove off with M.Z., and mother's brother called the police.

The last minute information for the court stated that "although this incident [of domestic violence] took place over 2 years ago, no charges were filed as a result of what took place that night between mother and father and according to mother and father [the July 2011 incident] was the only time during their relationship they engaged in a physical altercation." The CSW said that nonetheless father's physical assault of mother was "especially violent" based mother's report at the time, her injuries as documented in photographs the Department attached to its report, and the blood found on mother and on the sidewalk.

The last minute information for the court stated that "the fact [that] father became so explosive for no apparent reason other than mother wanted to pick up [M.Z.] and take her to a birthday party, continued his assault of mother for what seems to be more than a few minutes . . . and did so even after at least twice being urged to stop his assault of mother by [M.Z.'s] paternal grandfather, suggest father had a lot of anger/rage he manages to keep under control much of the time, but apparently there are triggers that cause father to completely lose control of his emotions, even when a small child ([M.Z.] was not yet 2 yrs. old on 07/12/11) is clearly in harm's way." Father told the CSW that he had not undergone counseling.

At the November 19, 2013, jurisdiction hearing, the juvenile court dismissed the original petition, stated that the first amended petition was filed on that day, stated that "[r]eading of the petition as amended is waived," ordered that "the case shall proceed to the existing trial date on 12-16-13," and ordered that "[a]ll parties present are ordered to return to court for the next hearing without further order, notice or subpoena."

The Department filed a last minute information for the court for a hearing scheduled for December 16, 2013, attaching father's criminal history, which included several arrests and one conviction. The criminal history provided that father was arrested

9

in 2001 for assault with a deadly weapon, in 2004 for vehicle theft and possession of a stolen vehicle, twice in 2006 for inflicting corporal injury on a spouse or cohabitant, in 2008 for carrying a concealed dirk or dagger—for which he was convicted in 2009, and on August 1, 2013, for a DUI.

On December 16, 2013, the juvenile court held an adjudication and disposition hearing. The minute order of that hearing states that the juvenile court found that notice of the proceedings had been given to all appropriate parties as required by law. At the hearing, the juvenile court dismissed the counts contained in the first amended petition under section 300, subdivision (a) concerning the July 12, 2011, physical altercation between father and mother, and under section 300, subdivision (b) concerning father's August 1, 2013, DUI incident endangered M.Z. The juvenile court sustained the other allegations contained in the first amended petition. Specifically, the sustained first amended petition stated, "b-1: [Mother] has a history of illicit drug use and is a current abuser of methamphetamine, which renders the mother incapable of providing regular care for [M.Z.] On 08/26/2013 and on prior occasions in 2013, . . . mother was under the influence of illicit drugs while [M.Z.] was in . . . mother's care and supervision. On 08/29/2013, . . . mother was arrested for an outstanding warrant for Possession of Controlled Substance. Such illicit drug use by the mother endangers the child's physical health and safety and places the child at risk of physical harm, damage and danger. [¶] b-3: [Mother] placed [M.Z.] in a detrimental and endangering situation in that on 08/29/2013, a glass methamphetamine pipe was found in [M.Z.'s] home, within access of [M.Z.] [Mother] allowed an unrelated adult male, a registered gang member and parolee, to reside in [M.Z.'s] home and have unlimited access to [M.Z.] [¶] b-4: On or about 07/12/2011, and on prior occasions, [mother and father] engaged in a violent altercation in the presence of [M.Z.] On 07/12/2011, . . . father punched . . . mother in the face three times with . . . father's fists, causing . . . mother to bleed from the nose and mouth. [Father] dragged . . . mother by the arms. [Father] threw . . . mother's keys at . . . mother, the keys striking . . . mother in the head. [Father] choked . . . mother. [Father] hit . . . mother in the face with a shoe. Such violent conduct on the part

10

of . . . father against . . . mother endangers [M.Z.'s] physical health and safety, and places M.Z.] at risk of physical harm, damage and danger.

As to disposition, the juvenile court ordered M.Z. removed from mother and father, and provided them with reunification services. Father was ordered to submit to weekly random drug and alcohol testing. The juvenile court asked father whether he had engaged in a domestic violence program since the July 2011 incident. Father said that he enrolled in classes "a few weeks ago." The juvenile court ordered father to participate in a 52-week domestic violence class, and in parenting classes and individual counseling. The juvenile court ordered reasonable monitored visits for the parents at least twice a week for two hours, to be monitored by the family members, with mother and father not to visit together. Father timely appealed, and the Department cross-appealed.

## DISCUSSION

### A.      Waiver of Trial Rights

Father contends that the juvenile court violated his constitutional due process rights because it did not ensure father knowingly, intelligently, and voluntarily waived his right to a contested jurisdiction and disposition. We disagree.

#### 1.      Background Facts

At the December 16, 2013, adjudication and disposition hearing, the following exchange occurred in father's presence: "[Juvenile court:] [A]re we ready to proceed on the adjudication? [¶] [The Department's counsel:] Uh—huh. [¶] [Mother's counsel:] Mother is submitting to the court's recommendation . . . regarding the allegations and submitting on the case plan. [¶] [Juvenile court:] With regard to the allegations in the petition, the court is— [¶] [The Department's counsel:] We need to mark and admit documents. [¶] [Juvenile court:] Yes."

After photographs of mother's injuries and of the blood located on the sidewalk taken following the July 2011 incident of domestic violence, and the Department's

11

reports, were marked as exhibits and introduced into evidence, the exchange continued as follows: "[Juvenile court:] All right. Those will all be marked and introduced into evidence. And the Department rests? [¶] [The Department's counsel:] Yes. [¶] [Juvenile court:] And any witnesses, [M.Z.'s counsel]? [¶] [M.Z.'s counsel:] No, Your Honor. [¶] [Juvenile court:] [Mother's counsel]? [¶] [Mother's counsel:] I am sorry. What was that? [¶] [Juvenile court:] Any witnesses? [¶] [Mother's counsel:] No, Your Honor. [¶] [Father's counsel:] No, Your Honor. [¶] [Juvenile court:] Do you wish to be heard, [the Department's counsel]? [¶] [The Department's counsel:] Your Honor, I believe, as counsel indicated, mother is submitting, I guess, on (b)(1) and (b)(3). So the primary issues then are the father. [¶] [Juvenile court:] Yes."

The Department's counsel then argued that the juvenile court should sustain all three counts alleged in the first amended petition concerning father—the two counts concerning father's violent conduct toward mother during the July 12, 2011, incident of domestic violence, and one count concerning father having driven under the influence of alcohol. As to the counts relating to father's violent conduct toward mother during the July 12, 2011, incident of domestic violence, the Department's counsel argued that the incident was "very serious," and father did not undergo domestic violence counseling. As to the count regarding father's DUI incident, the Department's counsel argued this incident too was "very serious," and father's "story" of what had occurred conflicted with the facts as reported in the police report.

M.Z.'s counsel argued that the juvenile court should sustain the count concerning father's DUI incident because the incident occurred recently, the children were in the car when the incident occurred, and father's version of what had occurred conflicted with the facts as reported in the police report. M.Z.'s counsel argued that the juvenile court should dismiss the counts concerning father's violent conduct toward mother during the July 12, 2011, incident of domestic violence, because the incident was remote in time, it was the only incident of domestic violence, and it does not appear at that time of the hearing that mother and father were residing together or that there was a risk of the incident reoccurring.

12

Father's counsel argued, in what is transcribed in over three pages of the reporter's transcript of the hearing, that the juvenile court should dismiss all three counts concerning father's conduct counts alleged in the first amended petition because there was "no nexus between what [was] pled in the allegations and [any] risk to the child today." As to the counts relating to father's violent conduct toward mother during the July 12, 2011, incident of domestic violence, father's counsel argued that the allegations were "simply an afterthought" by the Department, and the incident was remote in time. As to the count regarding father's DUI incident, father's counsel argued that it was only one instance of parental misconduct, the dependency investigator said she was uncertain whether the allegation was sufficient for the judicial court to find jurisdiction, and father had not been criminally convicted regarding the incident.

After further argument by the Department's counsel, the juvenile court stated, "In reviewing all of the paperwork, it appears as if the domestic violence incident occurring in July of 2011 was extremely serious. The physical injuries that mother sustained were obvious and pretty severe, and a lot of the conduct that occurred on that evening occurred with the child in the car. The child was in the car at the time, and the car was off, and their daughter was jumping around in the front seat between the victim [and father] when this incident happened. [¶] I can't believe for a moment that this child did not and has not sustained extremely emotional injuries as a result of seeing her mother and the father involved in this kind of conduct. [¶] I can't for the life of me after reading this report, viewing these injuries that mother sustained and in the presence of her child, that this child didn't sustain some emotional damage."

The juvenile court sustained count b-4 (concerning father's violent conduct toward mother during the July 12, 2011, incident of domestic violence),[2] and dismissed from the first amended petition count a-1 (concerning father's violent conduct toward mother) and

---

[2]     The juvenile court also sustained count b-1 (concerning mother's illicit drug use) and count b-3 (concerning mother's allowance of a unrelated registered gang member and parolee to reside in M.Z.'s home, and a methamphetamine pipe having been found in M.Z.'s home).

13

count b-2 (concerning father's DUI). The juvenile court found by clear and convincing evidence that there was a substantial danger to M.Z.'s physical and mental well-being, and reasonable efforts had been made to prevent removal. The juvenile court ordered that M.Z. be removed from her parents' custody. Father's counsel stated, "Your Honor, on behalf of my client, [father], based on all of the reasons I previously gave, he is objecting to the counts that the court sustained and also removal." The juvenile court's minute order of the jurisdiction and disposition hearing states that as to father the "[m]atter is adjudicated."

### 2.   *Analysis*

"If the parent or guardian denies the allegations of the petition, the court must hold a contested hearing and determine whether the allegations in the petition are true." (Cal. Rules of Court, rule 5.684(a).) "[T]he right to a contested hearing contemplates that a parent 'has the right to testify and otherwise submit evidence, cross-examine adverse witnesses, and argue his [or her] case.' [Citation.]" (*In re Josiah S.* (2002) 102 Cal.App.4th 403, 417.)

The hearing here was contested. The juvenile court admitted into evidence the photographs of mother following the July 2011 incident of domestic violence incident and the Department's reports. After father chose not to present any witness testimony, the hearing continued. Father's counsel, along with counsel for the Department and M.Z., then made extensive arguments on the three counts relating to father. Following argument of counsel, the juvenile court dismissed two of the counts regarding father's conduct, and sustained one of the counts regarding his conduct. As noted above, "[T]he right to a contested hearing contemplates that a parent . . . argue his [or her] case.' [Citation.]" (*In re Josiah S., supra,* 102 Cal.App.4th at p. 417.)

Father characterizes the hearing as a "*Malinda S.* hearing," and states there was a "submission pursuant to" *In re Malinda S.* (1990) 51 Cal.3d 368. Father contends that when a *Malinda S.* hearing is held the juvenile court is required to advise and take a waiver of a parent's trial rights. At the jurisdictional hearing in that case, testimony was

introduced and, over father's objection, the juvenile court admitted into evidence reports prepared by a social worker. (*Id*. at pp. 372-373, 375.) The Supreme Court held that hearsay contained in a social worker's report is admissible, provided the social worker is available to be cross-examined on the request of a parent. (*Id*. at p. 375, 382-386.) Although in *In re Malinda S., supra,* 51 Cal.3d 368, the court discussed that due process includes the right to a trial on the issues raised by the petition, the right to confront and cross-examine witnesses, and to compel the attendance of witnesses (*Id*. at pp. 383-384; *In re Monique T.* (1992) 2 Cal.App.4th 1372, 1377), it was in the context of the parent's right and ability to cross-examine the social worker concerning the hearsay statements contained in the social worker's report. *In re Malinda S., supra,* 51 Cal.3d 368 did not hold in that case that a juvenile court should have advised the parents of their trial rights and take their waiver of those rights.

In support of father's contention that the juvenile court was required to advise father of his trial rights and take a waiver of those rights, he cites California Rules of Court, rule 5.682(f)(3), *In re Monique T., supra,* 2 Cal.App.4th 1372, and *In re Patricia T.* (2001) 91 Cal.App.4th 400. These authorities are not applicable.

In lieu of a contested hearing, "The parent or guardian may elect to admit the allegations of the petition, plead no contest, or submit the jurisdictional determination to the court based on the information provided to the court and waive further jurisdictional hearing." (Cal. Rules of Court, rule 5.682(e).)[3] California Rules of Court, rule 5.682(f)(3) provides that if a parent so elects, the juvenile court is required to find that the parent "has knowingly and intelligently waived the right to a trial on the issues by the court, the right to assert the privilege against self-incrimination, and the right to confront and to cross-examine adverse witnesses and to use the process of the court to compel the

---

[3]     California Rules of Court, rule 5.682(e) also provides that a "Waiver of Rights—Juvenile Dependency form (JV-190) may be completed by the parent . . . and counsel and submitted to the court." The form states, inter alia, that the parent is "giving up . . . [¶] [the] right to a trial or hearing." (Waiver of Rights—Juvenile Dependency form (JV-190).)

15

attendance of witnesses on the parent or guardian's behalf[.]" California Rules of Court, rule 5.682(f)(3) is not applicable because father did not "admit the allegations of the petition, plead no contest, or submit the jurisdictional determination to the court based the information provided to the court and waive further jurisdictional hearing."

In *In re Monique T.*, *supra*, 2 Cal.App.4th 1372, the mother's counsel "submit[ted] the matter on the petition with the knowledge that the Court will almost undoubtedly find jurisdiction in this case." Mother's counsel stated that she "explained to [mother] and [was] satisfied that [mother] underst[ood] she's giving up her rights to have other evidence presented and have a contested matter." (*Id.* at p. 1376.) The court held that the juvenile court committed error in not explaining mother's trial rights to her and obtain her personal waiver of those rights, (*id.* at p. 1377) but that it was harmless error. (*Id.* at pp. 1378-1379.)

Unlike here, the mother in *In re Monique T.*, *supra*, 2 Cal.App.4th 1372 gave up her rights to "have a contested matter." There is no indication in that case that the mother engaged in a contested hearing by arguing why the juvenile court should find that there was no jurisdiction. Here, father's counsel argued extensively that the juvenile court should dismiss all three counts concerning father's conduct counts. It is not accurate to say that the juvenile court would "almost undoubtedly find jurisdiction in this case" (*id.* at p 1376) as to father's conduct. Indeed, following father's argument, the juvenile court dismissed two of the three counts regarding his conduct.

In *In re Patricia T.*, *supra*, 91 Cal.App.4th 400, after the Department submitted a report recommending that the juvenile court grant reunification services, mother pleaded no contest at the combined adjudication and dispositional hearing and initialed a waiver of rights form. (*Id.* at p. 403.) There is no indication in that case that the mother engaged in a contested hearing, including arguing why the juvenile court should grant reunification services. Following the no-contest plea, the juvenile court rejected the Department's recommendation and denied reunification services. (*Id.* at p. 403.) On appeal, the mother contended that "she did not understand that her waiver of a contested dispositional hearing would result in the denial of reunification services." (*Id.* at p. 402.)

16

The court affirmed the juvenile court's orders, holding that the mother was advised by the waiver form that the juvenile court could deny reunification services. (*Id*. at p. 407.) *In re Patricia T*., *supra*, 91 Cal.App.4th 400 is not applicable because father here did not plead no contest and a contested hearing was conducted.

Father also contends that we should reverse the juvenile court's jurisdictional order because the juvenile court never advised him of his rights pursuant to California Rules of Court, rule 5.534(k). Pursuant to that rule, "The court must advise the child, parent, and guardian in section 300 cases . . . of the following rights: [¶] (A) Any right to assert the privilege against self-incrimination; [¶] (B) The right to confront and cross-examine the persons who prepared reports or documents submitted to the court by the petitioner and the witnesses called to testify at the hearing; [¶] (C) The right to use the process of the court to bring in witnesses; and [¶] (D) The right to present evidence to the court." (Cal. Rules of Court, rule 5.534(k)(1).) Father, however, has not cited any case authority, nor are we aware of any, that holds it is reversible error for juvenile court not to advise a parent under California Rules of Court, rule 5.534(k)(1) of the parent's right to present evidence when the parent's counsel, in the parent's presence, decided not to present additional evidence at the jurisdictional and dispositional hearings, argued extensively why jurisdiction should not be found based on the conduct of that parent, and argued why the minor should not be removed from parent's from custody

Even if the juvenile court erred in not advising father of his right to present evidence and obtaining a personal waiver of those rights, father has forfeited this contention. Father was represented by counsel, and neither father nor his counsel objected to the manner in which the juvenile court conducted the hearing. Father was present at the hearing when his counsel said he would not introduce any additional evidence. "A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture, also referred to as 'waiver,' applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings. [Citations.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222; also, *In re Levi U.*

17

(2000) 78 Cal.App.4th 191, 201 [rejecting due process claim not raised below]; see also *In re Seaton* (2004) 34 Cal.4th 193, 198 [forfeiture applies to claims of statutory error and to claims of violation of fundamental constitutional rights].)

Even if father did not forfeit his claim of error, he failed to establish that he was prejudiced by the error. Error in failing to advise a parent of his or her trial rights and to obtain a personal waiver of those rights is subject to harmless error analysis. (*In re Monique T., supra,* 2 Cal.App.4th at pp. 1377-1378.) The court in *In re Monique T., supra,* 2 Cal.App.4th 1372, declined to decide which standard applied to determine harmless error: that of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) [harmless beyond a reasonable doubt], or of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) [reasonable probability of more favorable result]. (*Id.* at pp. 1378.) Any error here was harmless under either the *Chapman* or *Watson* standard.

Father was served with a notice of the November 19, 2013 jurisdiction hearing stating, inter alia, that, "You have the right to be present at the hearing, to present evidence, and to be represented by an attorney." At that November 19, 2013, hearing, the juvenile ordered that the parties were to "return to court for the next hearing," scheduled for December 16, 2013, "without further . . . notice." The minute order of the December 16, 2013, adjudication and disposition hearing states that the juvenile court found that notice of the proceedings had been given to all appropriate parties as required by law. At that December 16, 2013, adjudication and disposition hearing, defendant was represented by an attorney. Father makes no claim that his attorney did not explain his rights to him or that father did not consent to proceed. After the social worker's reports were admitted in evidence without objection and the Department rested, father's counsel, in father's presence, stated father had no evidence to present.

Father contends that he was prejudiced by not having been advised of his trial rights because "he could have proceeded with witnesses to show M.Z.'s emotional condition in regards to the July 2011 incident and whether there was in fact any emotional damage requiring the petition to be found true or M.Z. removed from her father." Father, however, does not state specifically how the juvenile court's failure to

18

advise him of his trial right affected the outcome.  He does not state that had he been properly advised of his trial rights he "would have" called witnesses.  He also fails to identify the witnesses he would have called, state the witnesses' likely testimony, or state what other evidence might have been presented.

### B.    Substantial Evidence

Father contends substantial evidence does not support the juvenile court's jurisdictional order based on father's violent conduct toward mother during the July 12, 2011, incident of domestic violence; or the dispositional order removing M.Z. from father's custody.  Father argues that there is insufficient evidence that father's violent conduct on July 12, 2011, placed M.Z. at risk of future harm.

### 1.    Standard of Review

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]  '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]"' [Citation.]"  (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321 [247 Cal.Rptr. 100].)' [Citation.]"  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

19

## 2. *Jurisdiction*

The juvenile court found that M.Z. is a dependent child of the juvenile court pursuant to section 300, subdivision (b) and sustained count b-1 (concerning mother's illicit drug use) and count b-3 (concerning mother's allowance of an unrelated registered gang member and parolee to reside in M.Z.'s home, and a methamphetamine pipe having been found in M.Z.'s home).

"'"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) "'[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent.' [Citations.] The child thus remains a dependent of the juvenile court." (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.) Under that line of cases, the juvenile court may retain jurisdiction based on the jurisdictional findings related to mother, regardless of the outcome on father's jurisdictional challenges.

We nevertheless have the discretion to hear the appeal as to jurisdiction based on father's conduct. "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

The finding that father's violent conduct toward mother during the July 12, 2011, incident of domestic violence was not only a basis for jurisdiction over M.Z., it was also

20

a basis for the dispositional order that father challenges on appeal. Thus, although dependency jurisdiction over M.Z. will remain in place because the findings based on mother's conduct are unchallenged, we will review father's appeal on the merits.

The juvenile court found that M.Z. is a dependent child of the juvenile court pursuant to section 300, subdivision (b) and sustained count b-4, which concerned father's violent conduct toward mother on July 12, 2011. Section 300, subdivision (b) provides in pertinent part: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the failure or inability of the parent or guardian to adequately supervise or protect the child . . . ."

"A jurisdictional finding under section 300, subdivision (b) requires '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' [Citation.] 'Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness.' [Citations.]" (*In re John M.* (2013) 217 Cal.App.4th 410, 418.) The Department "has the burden of showing specifically how [the child has] been or will be harmed. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.)

"'[C]ases finding a substantial physical danger tend to fall into two factual patterns. One group involves an *identified, specific hazard* in the child's environment— typically an adult with a proven record of abusiveness. [Citations.] The second group involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety. [Citations.]' [Citation.]" (*In re Drake M., supra,* 211 Cal.App.4th at p. 767.) A current risk of harm can be shown by evidence of past conduct, if there is a reason to believe the conduct will recur. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394; *In re S.O.* (2002) 103 Cal.App.4th

453, 461-462.) "Juvenile dependency law in general does not require a child to be actually harmed before [the Department] and the courts may intervene. [Citation.]" (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 383, fn. 3.) "'The purpose of dependency proceedings is to prevent risk, not ignore it.' [Citation.]" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

Father contends that the July 12, 2011, incident of domestic violence, without more, does not support jurisdiction over M.Z., reasoning a "single episode of parental misconduct is insufficient to bring the minor within the juvenile court's jurisdiction." (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1023-1024, 1026.) Substantial evidence however supports the juvenile court's finding of jurisdiction over M.Z.

"In evaluating risk based upon a single episode of endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances. It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim, and probationary support and supervision already being provided through the criminal courts that would help a parent avoid a recurrence of such an incident. The nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk depending upon present circumstances." (*In re J.N.*, *supra*, 181 Cal.App.4th at pp. 1025-1026; *In re John M*., *supra*, 217 Cal.App.4th at pp. 418-419.)

At the time of the July 12, 2011, incident of domestic violence, M.Z. was about one and one-half years old. There was evidence that during the incident father became physically violent with mother. At one point, father pulled M.Z. forcibly from mother's arms. Family members intervened multiple times, but father and mother continued to fight. Mother sustained substantial injuries, and blood was located on the sidewalk in the front of father's residence. M.Z. witnessed a large part of the physical violence between father and mother.

22

The juvenile court found the July 2011 domestic violence incident between father and mother was "extremely serious" and that mother's injuries were "obvious and pretty severe." It was reasonable for the juvenile court to infer that M.Z. suffered emotional distress. In addition, father was convicted in 2009 for carrying a concealed dirk or dagger, arrested for domestic violence twice in 2006, and arrested for assault with a deadly weapon in 2001.

Father's attitude about his acts of violence provided further evidence that M.Z. remained at risk. Father did not engage in any counseling or other treatment program to address his violence, except, according to father, having enrolled in domestic violence classes "a few weeks" before the disposition hearing. Father had minimized his incident of domestic violence, stating that mother was the instigator and describing his actions as merely responding to mother's aggression. He did not admit to punching or choking mother, and said that he threw a shoe at mother in response to her first throwing the shoe at him, hitting him in the face. The juvenile court did not believe mother's injuries and the blood on the ground were consistent with father's version of the events. Accordingly, father did not demonstrate that he understood how his past actions placed M.Z. at risk. He did not seem to have learned from those actions, or committed himself to behaving differently in the future. There was substantial evidence to support the juvenile court's jurisdictional order based on father's violent conduct toward mother during the July 12, 2011, incident of domestic violence and his reaction to the incident.

### 3. Disposition

As relevant here, section 361, subdivision (c) prohibits the juvenile court from removing a child from his or her parents' custody "unless the juvenile court finds clear and convincing evidence [that] . . .: [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (See also Cal. Rules of Court, rule 5.695(d).) "A

removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1136, disapproved on another point in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

For the reasons described above regarding the juvenile court's sustaining the petition under section 300, subdivision (b) concerning father's violent conduct toward mother on July 12, 2011, substantial evidence showed M.Z. would be at risk of harm if she were released to father. The juvenile court described the July 2011 domestic violence incident between father and mother, which occurred largely in M.Z.'s presence, to be "extremely serious," with mother's injuries being "obvious and pretty severe." Father had minimized his incident of domestic violence. Father had a history of being arrested for domestic violence and for committing an assault with a deadly weapon, and father was convicted in 2009 for carrying a concealed dirk or dagger. Father had not completed counseling addressing the underlying causes of his violent behavior. This evidence is sufficient to support a reasonable inference that at the time of the disposition order father still did not fully appreciate the risk his conduct posed to M.Z. When this evidence is viewed in a light most favorable to the disposition order, indulging all reasonable inferences and resolving all factual conflicts in favor of that order as we are required to do, it supports the juvenile court's finding that returning M.Z. to father's custody would be contrary to M.Z.'s best interests.

### C.    Dismissal of Count Regarding Father's DUI

In its cross-appeal, the Department contends that substantial evidence does not support the juvenile court's order dismissing the count regarding father's DUI. There is no need to reach the merits of the Department's challenge on its cross-appeal, however, because the juvenile court found that it had jurisdiction over M.Z. based on illicit drug

use, her allowance of an unrelated registered gang member and parolee to reside in M.Z.'s home, and a methamphetamine pipe having been found in M.Z.'s home. We have also affirmed the juvenile court's jurisdiction order concerning father's violent conduct toward mother on July 12, 2011.

As noted above, a "'reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) "'[T]he minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent. [Citations.]'" (*In re X.S.*, *supra*, 190 Cal.App.4th at p. 1161.)

The juvenile court's jurisdictional findings against both mother and father were sufficient to support the juvenile court's exercise of jurisdiction over M.Z. The Department has not provided any reasons for addressing the merits concerning the dismissed count. Both parents are offending parents. There would be no effect on the disposition, and there is no indication the findings could have consequences beyond dependency jurisdiction. We therefore elect not to address the propriety of the dismissal of the count regarding father's DUI.

**DISPOSITION**

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P. J.


MINK, J.*

---

*     Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.